# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 11-60285-CR-ROSENBAUM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

BOBBY RICKY MADISON,

        Defendant.

_____/

## ORDER ON DEFENDANT MADISON'S
## MOTION TO SUPPRESS CELL PHONE RECORDS [D.E. 198]

This matter is before the Court on Defendant Bobby Ricky Madison's Motion to Suppress Cell Phone Records [D.E. 198]. The Court has reviewed Defendant's Motion, all supporting and opposing filings, and the entire record, and has held an evidentiary hearing on Defendant's Motion on July 24, 2012. After careful consideration, the Court now denies Defendant's Motion for the reasons set forth below.

### *I.  Background and Findings of Fact*

Defendant Bobby Ricky Madison is charged in a Second Superseding Indictment [D.E. 262] along with five other defendants with (1) conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 1); (2) two counts of attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Counts 2 and 4); (3) use and carrying of a firearm during and in relation to, and possession of a firearm in furtherance of, the conduct charged in Counts 1 and 2 of the Second Superseding Indictment, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 3); and (4) use and carrying

of a firearm during and in relation to, and possession of a firearm in furtherance of, the conduct

charged in Counts 1 and 4 of the Second Superseding Indictment, in violation of 18 U.S.C. §

924(c)(1)(A) (Count 5). The charges stem from a series of alleged attempted robberies of Brinks

securities guards at Bank of America branches. *See* D.E. 262.

During the course of the investigation that resulted in Defendant's indictment, the

Government submitted an Application for Court Order for Disclosure of Historical Cell Site Records

[D.E. 198] ("Application"), pursuant to 18 U.S.C. § 2703©-(d). This Application sought disclosure

of the following:

> (a)  records reflecting the location of cellular towers (cell site and sector/face);
>
> (b)  toll records related to the use of a cellular telephone assigned the telephone number 754-234-7001 for the period from May 1, 2010, through and including February 1, 2011; and
>
> ©  subscriber information and account notes for the same cellular telephone[.]

D.E. 198 at 9.[1] In support of the Application, an Assistant United States Attorney set forth the

following allegations to establish "specific and articulable facts showing that there are reasonable

grounds to believe that the records and other information sought are relevant and material to an

ongoing criminal investigation":

> a.  On October 1, 2010, at approximately 11:55 a.m., a Brinks armored car messenger was delivering approximately $397,500.00 in United States currency to Bank of America, located at 7950 Miramar Parkway, Miramar, Florida, located in Broward County, in the Southern District of Florida. As

---

[1]Some of the documents in the case file include two page numbers: the original page number and the page number imprinted by the CM/ECF system across the top of each page filed with the Court. This Order refers to the number imprinted by the CM/ECF system.

the Brinks messenger attempted to enter the branch, two black males carrying firearms approached him. One individual was later identified as Nathaniel Moss. According to multiple eyewitnesses, Moss, wearing a bright orange traffic safety vest, held a firearm to the messenger's head. Moss then shot the messenger in the head, fatally wounding him. The second subject (Subject 2) grabbed a bag of money belonging to Brinks.

b.　　Moss and Subject 2 fled the scene. Surveillance video shows Subject 2 entering the front passenger side of a white Toyota Camry. The vehicle traveled south through a strip mall parking lot near the bank, coming to a stop after colliding with a trash dumpster. Upon police arrival, the vehicle had been abandoned. Moss was apprehended hiding in bushes a short distance from where the car had come to a stop. Later investigation revealed that the car had been reported stolen on or about September 17, 2010, from the Coconut Creek, Florida, area.

c.　　Near Moss, officers recovered a bright orange traffic safety vest. Moss was wearing a ballistic vest, and had in his possession a pair of pliers and a pair of latex gloves.

d.　　A civilian eyewitness positively identified Moss as the individual who shot the Brinks messenger.

e.　　An eyewitness saw two black males enter a vehicle near the area where Moss was subsequently found hiding. The eyewitness told law enforcement the first three digits of the license plate of that car. That car, which is a silver Honda Civic, was located a little more than a mile from the scene of the robbery. The car had been abandoned with the engine still running. Later investigation revealed that the car had also been reported stolen on or about September 28, 2010, from the Coconut Creek, Florida, area.

f.　　Agents recovered one Brinks courier bag containing a total of $395,000.00 in U.S. currency from inside the white Toyota Camry. The remaining $2,500 in U.S. currency was recovered outside the bank at the scene of the shooting.

g.　　On October 2, 2010 an autopsy was conducted by the

Broward County Medical Examiner of the messenger shot at the scene. The examiner determined that the cause of death was a gunshot wound to the head.

h.    Brinks is a company that operates inside and outside the State of Florida. Bank of America is a bank, the deposits of which are federally insured, and which has locations both inside and outside the State of Florida. Bank of America and nearby stores were shut down for a period of time as a result of the robbery.

I.    Pursuant to an order signed by Magistrate Judge Robin S. Rosenbaum on October 7, 2010, the FBI has received toll and historical cell site records for the cellular telephone assigned number 786-258-6024, which is believed to be used by Moss.

j.    Analysis of those records reveals that, at approximately 2:37 a.m. on September 17, 2010 (the day the white Toyota Camry was reported stolen), Moss's phone received a sixty (60) second telephone call from the Metro PCS cellular telephone assigned number 786-307-4240. At that time, Moss's phone was in the Opa-Locka, Florida area, where he was believed to have resided. At approximately 4:24 a.m., Moss's phone and the phone assigned number 786-307-4240 had a 171 second call. At that time, Moss's phone was in Coconut Creek, Florida (the area from which the Camry was reported stolen). At approximately 4:37 a.m., the two numbers had a 2,123 second (approximately 35 minute) call. During the call, Moss's phone was in transit. At the beginning of the call, Moss's phone was in Coconut Creek, Florida, and it ended in the Miami Gardens, Florida, area.

k.    Analysis of the toll and cell site records for Moss's phone further reveals that, on September 28, 2010 (the day the silver Honda Civic was reported stolen), Moss's phone made or received several calls with the Metro PCS cellular telephone assigned number 786-419-2326. At 4:57 a.m., the two numbers connected for 1,936 seconds. At the beginning of that call, Moss's phone was in Coconut Creek, Florida (the area from which the Civic was reported stolen), and it ended in the Miami Gardens, Florida, area.

l.    The toll and cell site records for Moss's phone for the period

of September 1, 2010 through October 1, 2010 show that he was in the Coconut Creek, Florida area only during the two times when the vehicles used as getaway cars in the robbery were stolen.

m.    Sources have identified Bobby Ricky Madison as a person possibly involved in the armored car robbery that occurred on October 1, 2010.  Madison is also a known associate of Moss and Moss's other associates.  From document[s] regarding a prior arrest of Madison, the FBI has learned that Madison uses a cellular telephone assigned the number 754-234-7001.

n.    Madison lives in the Opa Locka area near where Moss resides.  In May 2010, officers in the same Coconut Creek area from which the two stolen vehicles used in the October 1, 2010, robbery were stolen attempted to perform a traffic stop of a vehicle Madison was driving.  He lead the officers on a high-speed car chase before eventually being apprehended.  The car he was driving was reported stolen from that same Coconut Creek area at approximately the same time of day as the two vehicles used in the October 1, 2010, robbery.

o.    Subscriber information, toll records, and historical cell site information for Metro PCS phone 754-234-7001 would reveal if this phone was in the Coconut Creek area when the two getaway vehicles were stolen, or the area of the robbery on October 1, 2010.

D.E. 198 at 10-13.  Based on this averment of facts, the magistrate judge found that the Government had "offered specific and articulable facts showing that there are reasonable grounds to believe that the records and other information sought are relevant and material to an ongoing criminal investigation" and issued an order directing Metro PCS to disclose to the Government the requested information[2] ("Order").  D.E. 198 at 15.

---

[2]I was the issuing magistrate judge at the time.  Since then, I have been appointed as a district judge, and this case has been transferred to me.  The law does not preclude the issuing judge from ruling on a motion to suppress information obtained pursuant to the order issued.  *Cf. United States v. Slay*, 714 F.2d 1093, 1094-95 (11th Cir. 1983); *United States v. Jones*, 801 F.2d

Defendant seeks to suppress the records obtained pursuant to the Order under two theories: (1) the obtaining of the records at issue constituted a search under the Fourth Amendment for which a finding of probable cause was necessary,[3] and (2) even if the lower standard under 18 U.S.C. § 2703 governs the issuance of the Order, the Government made false statements to obtain the Order, and once such allegedly false statements are disregarded, an insufficient basis remains for finding the Section 2703 standard satisfied.

The Court held a hearing on Defendant's Motion to Suppress on July 24, 2012. At that hearing, Defendant testified that beginning in mid-to-late 2010, he used a cell phone with the number 754-234-7001. According to Defendant, Co-defendant Brown obtained the telephone for him under the name Madison Swim Club. Defendant possessed and used the telephone, but he also allowed Brown to use it sometimes. Defendant further testified that he stopped using the telephone about a month before the October 1, 2010, robbery and shooting because he was no longer able to pay the bills for the telephone.

The Government then presented evidence that it obtained from Metro PCS two types of information related to cell site location data: (1) call-detail information and (2) cell-tower records. The call-detail information, which is generated only when a cell phone is used, provides the date and time of a call, the number with whom the call occurred, the duration of the call, the direction of the call (whether the call was incoming or outgoing), and the codes for the cell sites and sectors involved in the call. Cell tower records identify the locations corresponding to the codes of the cell towers

_____

304, 312 (8th Cir. 1986); *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985).

[3]This basis is not raised in Defendant's Motion, but Defendant argued it during the hearing on Defendant's Motion.

and sectors appearing in the call-detail information. Typical cell towers have three sectors, but the number can vary from one to several. Each sector services basically a cone extending from the tower out to the limits of the tower's service area. Once the Government obtains the call-detail information and the cell-tower records, the Government plots maps that show the general vicinities in which the cell phone was located during the periods when particular cell-phone calls were made or received. These maps reflect that a call occurred within an area that covers several city blocks. Pinpoint accuracy, or even near-pinpoint accuracy, is not possible with these particular records. Based on her review of the cell-phone use maps that the Government created during the course of the investigation in this matter, counsel for Defendant agreed at the hearing with the Government's description of the location information obtained from Metro PCS pursuant to the Order.

With regard to the substantive allegations contained in the Application, Defendant challenged three statements in particular contained in the Application. Federal Bureau of Investigation ("FBI") Task Force Officer Gerard Starkey testified as to the basis for each of the statements at issue.

Defendant began by taking issue with the statement in the Application, "Sources have identified Bobby Ricky Madison as a person possibly involved in the armored car robbery that occurred on October 1, 2010." Officer Starkey testified that at the time that the Application was submitted, law enforcement believed Defendant to have "possibly been involved" in the October 1, 2010, robbery based on three pieces of information.

First, following the robbery, law enforcement discovered that an International House of Pancakes ("IHOP video") near the Bank of America where the robbery occurred had captured part of the robbery on its surveillance video. The media broadcast the IHOP video, and two sources that law enforcement deemed credible advised law enforcement that they believed that the robbery

participant wearing the green hoodie in the IHOP video was Defendant. According to Officer Starkey, both of these tipsters had had "extensive contact" with Defendant through their profession, and neither was a paid informant. As Officer Starkey described them, the individuals providing the information were involved in a "reliable profession," more specifically, the court system.

Second, during the course of the investigation, Officer Starkey consulted with FBI Special Agent Jose Perez, who was investigating drug-trafficking organizations. As Officer Starkey explained the information he received from Agent Perez, one of the drug-trafficking organizations that Agent Perez was investigating allegedly involved Moss and Co-defendant Brown, who, at that time, was a person of interest in the investigation leading to the instant indictment. The drug-trafficking investigation had established Defendant as a known associate of Moss and Co-defendant Brown, although Officer Starkey conceded that he did not believe that Defendant was identified as speaking on a single telephone call recorded while a Title III wiretap was in place. Officer Starkey further testified that besides Agent Perez, four other law enforcement officers, including Danny Villanueva, Pete Chong, Yani Hernandez, and Steve Corley, had all independently of each other informed Officer Starkey that, based on their investigative work in matters other than the October 1, 2010, Brinks robbery, Defendant was a known associate of Moss and Co-defendant Brown. Moreover, on the day of the robbery, after the robbery had occurred, law enforcement encountered Defendant at Co-defendant Brown's residence, supporting the intelligence that Defendant was an associate of Brown.

As Defendant points out, however, during this encounter, Defendant advised law enforcement that he had had an 8:30 a.m. court hearing in Broward County earlier that day, and then he had taken two buses to arrive at Co-defendant Brown's residence, thus suggesting an alibi for 11:30 to 12:00

p.m., the approximate time when the October 1, 2010, robbery occurred. Although law enforcement confirmed that Defendant had been scheduled for an 8:30 hearing, when Officer Starkey contacted the clerk's office to learn whether Defendant had, in fact, appeared for the hearing, the clerk's office advised Officer Starkey that it would not provide that information over the telephone, and Officer Starkey needed to consult the court's website. The website, however, did not contain the information that Officer Starkey sought.

Nevertheless, two days after the Government obtained the Order authorizing it to obtain cell-site information, on February 4, 2011, Officer Starkey was able to learn from the state prosecutor on Defendant's case that Defendant had been present in court in Broward County for a hearing earlier in the day on October 1, 2010. According to Officer Starkey, however, even had he had this information when the Government submitted its Application, Defendant's attendance at his 8:30 a.m. court hearing did not necessarily mean that Defendant could not have been physically present for the October 1 robbery, which occurred approximately three to three-and-a-half hours later in Miramar (also in Broward County), or even if Defendant had not been at the October 1 robbery, that he was not involved in the planning of the robbery, in light of other evidence that the investigation had gathered. Presently, though, Officer Starkey concedes that the Government has since come to believe that Defendant was not physically present for the October 1, 2010, robbery, but it continues to suspect that Defendant was nonetheless involved in the planning of that event.[4]

---

[4]After the Court issued the Order authorizing the Government to obtain the cell-site records, Moss pled guilty and cooperated with the Government. *See* D.E. 158 at 4. At Defendant's detention hearing, the Government stated that in his debriefings, Moss advised that on September 17, 2010, Defendant and the robbery crew attempted to rob another Brinks messenger at Bank of America in Miramar. *Id.* According to Moss, Defendant drove a stolen Infiniti SUV. *Id.* This robbery, however, did not proceed. *Id.* The police happened to be on the scene because of an unrelated traffic accident in the area, so the group decided to call off the

Third, Officer Starkey became aware that on May 25, 2010, Defendant was arrested after a high-speed chase, driving a car stolen from the same Coconut Creek area where the two vehicles used in the October 1, 2010, robbery had been stolen. Also like the cars used in the October 1, 2010, robbery, the car that Defendant was driving at the time was also stolen at in the very early morning hours. The police reports of the incident stated that at the time of his arrest on May 25, 2010, Defendant was in possession of two screw drivers, a small flashlight, and a glove. This made the May 25, 2010, vehicle theft even more significant to Officer Starkey, as the investigation of the October 1, 2010, crime scene found burglary tools and observed that the two stolen cars used in that robbery had had their steering columns accessed by prying away the plastic.

Based on all of these factors, Officer Starkey testified, the Government believed itself to have a good-faith basis in asserting that "[s]ources have identified Bobby Ricky Madison as a person possibly involved in the armored car robbery that occurred on October 1, 2010." This Court agrees, although the Government should have noted Defendant's alleged alibi.

Next, Defendant argues with the Application's assertion that Defendant "is also a known associate of Moss and Moss's other associates." For the reasons described above, including information that the Government had obtained from other law-enforcement agents and law enforcement's encounter with Defendant at Co-defendant Brown's residence on the day of the robbery, the Court concludes that the Government also had a good-faith basis for this allegation.

Defendant also contends that the Application statement that "Madison lives in the Opa Locka

_____

robbery. *Id.* When Defendant saw police, Moss recounted, he drove the SUV to the south of the plaza and fled on foot to a waiting second getaway car. *Id.* Moss explained that the rest of the group was angry at Defendant for panicking and kicked him out of robbery crew after the September 17th attempt. *Id.* As a result, Moss asserted, Defendant was not a part of the physical crew for the October 1st robbery where the Brinks messenger was killed. *Id.* at 4-5.

area near where Moss resides" is false. Officer Starkey testified that this contention was based on Defendant's statement at the time of his May 25, 2010, arrest that he lived at 1044 Northwest 52nd Street in Miami, Florida. As Officer Starkey reasoned, Miami is "adjacent" to Opa Locka, so it is in the Opa Locka area.

The Court has taken judicial notice of Defendant's address in comparison to the location of Opa Locka. The distance between the two is approximately eight miles, or about twenty minutes without traffic. Whatever the Government might have meant by its contention that Defendant "lives in the Opa Locka area near where Moss resides," this Court understands that phrase to suggest that Defendant and Moss resided in the same neighborhood. That is not accurate.

## *II. Discussion*

### A. Standing

The party moving to suppress bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search. *Rakas v. Illinois*, 439 U.S. 128, 131 n.1 (1978). To demonstrate standing, Defendant must show that he had a legitimate expectation of privacy in the telephone records obtained through the Order. *United States v. Sneed*, 732 U.S. 886, 888 (1984) (citation omitted). Making this determination, however, necessarily requires the Court to decide the substantive issue — that is, whether obtaining the phone records constituted a search for purposes of the Fourth Amendment, thus requiring probable cause. *See United States v. Graham*, 2012 WL 691531, *11-12 (D. Md. March 1, 2012) (citing *Rakas*, 439 U.S. at 138-39). For this reason, the Court determines Defendant's standing in the context of ruling on the substantive issue.[5]

_____

[5]This is not a case where standing clearly does not exist, such as where a defendant seeks to suppress the records of someone else's telephone in which that defendant has no personal interest. Nor does this case involve a telephone obtained under a fictional name with no

B.  The Appropriate Standard for the Issuance of the Order

While Defendant concedes that 18 U.S.C. § 2703 authorizes a mechanism for the Government to obtain historical cell-site information without establishing probable cause,[6] *see* D.E. 198 at 3, Defendant urges the Court to find that the Fourth Amendment nonetheless demands a finding of probable cause before an order for cell-tower information can be issued.[7]  Thus, the Court begins its analysis with a discussion of relevant Fourth Amendment jurisprudence.

The Fourth Amendment ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  Most recently, in *United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945 (2012), the Supreme Court held that the

---

relationship to Defendant.  *See United States v. Davis*, 2011 WL 2036463, *2 ("[A]lthough an individual may have a subjective expectation of privacy in property that is attached to a fictitious name, that is not a privacy interest that society recognizes as reasonable") (citation omitted).  Rather, the telephone was subscribed to in the name of Madison Swim Club, and Defendant's last name is "Madison."

[6] Many courts have held that 18 U.S.C. § 2703 governs the requirements for obtaining historical cell-site tower data.  *See, e.g., In re Application of United States for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 620 F.3d 304 (3d Cir. 2010); *In re Application of U.S. for an Order Pursuant to 18 U.S.C. § 2703(d)*, ___ F. Supp. 2d ___, 2012 WL 989638 (D. Mass. Mar. 23, 2012); *United States v. Graham*, ___ F. Supp. 2d ___, ___ 2012 WL 691531, *11 (D. Md. Mar. 1, 2012) ("It is well established that Section 2703(c)(1)(B) of the Stored Communications Act applies to historical cell site location data.") (citations omitted); *In re U.S. for an Order Authorizing the Release of Historical Cell-Site Information*, 809 F. Supp. 2d 113, 115 (E.D.N.Y. 2011).  Section 2703(c)(1) authorizes the Government to "require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)" when the conditions of Sections 2703© and (d) are satisfied.  Similarly, Section 2703(c)(2) allows the Government to obtain from a "provider of electronic communication service" "local and long distance telephone connection records, or records of session times and durations," among other records.  As information pertaining to a subscriber and as a record of telephone connections, times, and durations, cell-site location data fulfills the requirements of Sections 2703(c)(1) and (2).

[7] Defendant pursued this argument during the July 24, 2012, hearing.

Government's attachment of a global-positioning-system ("GPS") device to a vehicle and its use of that device to monitor the vehicle's movements constituted a search under the Fourth Amendment. Central to the Court's analysis was the concept of trespass that the Court found applied because the Government had made a physical intrusion in the form of the GPS device on an "effect" — the vehicle — in order to obtain information. *See id.* at 949-54. In reaching this conclusion, however, the Court noted that "[s]ituations involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* [*v. United States*, 389 U.S. 347 (1967)] analysis." *Jones*, 132 S. Ct. at 953; *see also United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945, 955 (Sotomayor, J., concurring).

Because obtaining cell-site information does not involve a physical intrusion but instead concerns "merely the transmission of electronic signals," the Court turns to *Katz* and its progeny. In *Katz*, the Government attached an electronic listening device to the outside of a public telephone booth and used the device to intercept the contents of a telephone conversation. Reasoning that "[t]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth . . . ," the Court held that the Government had conducted a Fourth Amendment search. *Katz*, 389 U.S. at 353. In his concurrence in *Katz*, Justice Harlan distilled this analysis into a two-part test: "first . . . a person [must] have exhibited an actual (subjective) expectation of privacy and, second, that . . . expectation [must] be one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361 (Harlan, J., concurring).

Particularly relevant to the issue presently pending is the Supreme Court's application of this test in *Smith v. Maryland*, 442 U.S. 735 (1979). In *Smith*, the Court considered whether the

installation and use of a pen register to collect information about which numbers the petitioner had

dialed from his home telephone constituted a search under the Fourth Amendment. In concluding

that it did not, the Court reasoned first that the petitioner could not have held any subjective

expectation of privacy in the numbers that he had dialed. *Id.* at 740-43. As the Court explained,

> All telephone users realize that they must "convey" phone numbers
> to the telephone company, since it is through telephone company
> switching equipment that their calls are completed. All subscribers
> realize, moreover, that the phone company has facilities for making
> permanent records of the numbers they dial, for they see a list of their
> long-distance (toll) calls on their monthly bills. . . .

*Id.* at 742.[8]

Similarly, in order for a cellular telephone connection to occur, a user's cell phone must

transmit a signal to cell tower within range. This happens only when a user makes or receives a

telephone call. In that case, the cell tower functions as the communication company's switching

equipment that allows the call to proceed. All cell users are aware that cell telephones do not work

when they are outside the range of the communication company's cell-tower network. And it is

---

[8]The Supreme Court also rejected the petitioner's argument that a search had occurred
because the telephone on which the pen register was used was located within his home, even
though five years after *Smith*, the Supreme Court held in *United States v. Karo*, 468 U.S. 705,
731 n.4 (1984), that the Government's placement of a beeper in a package that entered the
petitioner's home constituted a search because it enabled the Government to learn facts that were
otherwise not exposed to public view. According to the *Smith* Court, "Although petitioner's
conduct may have been calculated to keep the *contents* of his conversation private, his conduct
was not and could not have been calculated to preserve the privacy of the number he dialed.
Regardless of his location, petitioner had to convey that number to the telephone company in
precisely the same way if he wished to complete his call. . . ." *Smith*, 442 U.S. at 743 (emphasis
in original). As the cell-tower data obtained by the Government in the above-captioned matter
included location information accurate only within a few blocks — as opposed to enabling the
Government to determine whether Defendant had entered an area that was not exposed to the
public — this Court need not consider whether *Karo* imposes some other requirement on the
*Smith* analysis.

nearly impossible to avoid regularly seeing cell towers in an urban area such as the Southern District

of Florida. Thus, just as the petitioner in *Smith* knew that when he dialed telephone numbers he was

"conveying" them to the telephone company, *see Smith*, 442 U.S. at 742, cell-phone users have

knowledge that when they place or receive calls, they, through their cell phones, are transmitting

signals to the nearest cell tower, and, thus, to their communications service providers.[9]

Moreover, the cell-phone-using public knows that communications companies make and

maintain permanent records regarding cell-phone usage, as many different types of billing plans are

available, including unlimited use, limited minutes with additional charges for extra minutes, and

prepaid. Some plans also impose additional charges when a cell phone is used outside its "home

area" (known commonly as "roaming" charges). In order to bill in these different ways,

communications companies must maintain the requisite data, including cell-tower information.

Indeed, a particular problem that law enforcement has encountered in recent years centers around

the use of prepaid cell phones under false names in order to avoid law-enforcement detection through

the obtaining of cell-phone records maintained by communications companies. This fact further

demonstrates the common knowledge that communications companies regularly collect and maintain

all types of non-content information regarding cell-phone communications, including cell-site tower

data, for cell phones for which they provide service. In short, this Court concludes that *Smith*'s

analysis dictates the finding that Defendant could not have held a subjective expectation of privacy

in information about the cell towers off which his cell-phone signal bounced when he dialed or

---

[9]The type of cell-tower data at issue here is created only when a call is made or received
by the telephone for which information is obtained. Furthermore, in this case, there is no
indication that law enforcement made telephone calls to Defendant's number for the purpose of
determining where he was at any given time.

received calls.

In the *Smith* Court's consideration of *Katz*'s second prong, after concluding that the petitioner

harbored no subjective expectation of privacy, the Supreme Court then determined that even if he

had, the petitioner's expectation was not "one that society is prepared to recognize as 'reasonable.'"

*Smith*, 442 U.S. at 743 (quoting *Katz*, 389 U.S. at 361). As the Court explained,

> This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties. . . . In [*United States v. Miller*, 425 U.S. 435 (1976)], for example, the Court held that a bank depositor has no "legitimate 'expectation of privacy'" in financial information "voluntarily conveyed to . . . banks and exposed to their employees in the ordinary course of business." 425 U.S. at 442. . . .
>
> Because the depositor "assumed the risk" of disclosure, the Court held that it would be unreasonable for him to expect his financial records to remain private.
>
> This analysis dictates that petitioner can claim no legitimate expectation of privacy here. When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and "exposed" that information to its equipment in the ordinary course of business. In so doing, petitioner assumed the risk that the company would reveal to police the numbers he dialed. The switching equipment that processed those numbers is merely the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber.

*Id.* at 743-44.

Under *Smith*'s reasoning, this Court must reach the same determination with regard to cell-

site tower information.[10] Just as the *Smith* petitioner's actions of making telephone calls provided

---

[10]Obviously, the framers of the Constitution did not contemplate the type of technology at issue in this case. Most likely, nor did the Supreme Court when it decided *Smith*. As Justice Sotomayor recently noted, "[I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties." *United States v. Jones*, ___ U.S. ___, ___, 132 S. Ct. 945, 957 (2012) (Sotomayor, J.,

information to the petitioner's telephone company, Defendant knowingly and voluntarily gave information to his communications-service provider that he was located within the range of specific cell towers at the times that he made and received telephone calls on his cell phone.  And, like the switching equipment that the *Smith* Court described as "the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber," the cell towers that allowed Defendant to make and receive telephone calls on his cell phone functioned as today's equivalent of a bygone era's human operator.  For these reasons, the third-party-disclosure doctrine relied upon by *Smith* requires the finding that society is not prepared to recognize as legitimate any subjective expectation that Defendant might have had in the cell-tower location data for his cell-phone usage.[11]

C.  The Allegations in the Application Satisfy the § 2703(d) Standard

Because the Fourth Amendment does not impose a probable-cause requirement on the obtaining of cell-tower information such as that at issue in this case, the Court evaluates whether the Government's Application meets the standards set forth in Section 2703(d).  In order to qualify for

_____

concurring); *see also id*. at 957-64 (Alito, J., concurring) ("[T]he *Katz* test rests on the assumption that this hypothetical reasonable person has a well-developed and stable set of privacy expectations.  But technology can change those expectations.").  This Court agrees that the time may indeed have arrived to reevaluate the Fourth Amendment framework as it applies to new technologies.  Nevertheless, under the existing Fourth Amendment jurisprudence, this Court finds *Smith* to require the result set forth in this opinion.

[11]Although this Court recognizes the content exception to the third-party-disclosure doctrine as it relates to communications providers, the logical extension of the third-party-disclosure doctrine as expressed under *Smith* and its progeny still runs the risk in today's technological world of shielding from Fourth Amendment probable-cause requirements information that many would suggest should be subject to protection.  Such extensions of the doctrine, however, are not presently before this Court and this Court therefore does not purport to opine on the correct analysis of such issues.  Rather, this Court's holding is limited to the narrow issue before it: whether cell-tower information that generally divulges a person's location within a few city blocks is subject to the Fourth Amendment's probable-cause requirement.

the issuance of a court order pursuant to Section 2703(d), the Government must offer "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Defendant argues that the allegations contained in the Government's Application fail to satisfy this standard.

The Section 2703(d) standard is lower than that of probable cause. *In re Application*, 620 F.3d 304, 313 (3d Cir. 2010); *United States v. Warshak*, 631 F.3d 266, 291 (6th Cir. 2010). As the Third Circuit has described this standard, the Government must state "specific facts in its application[] that provide[] a basis for believing that [the person whose cell phone records are being sought] [is] a suspect and that cell phone records [are] relevant to solving the case." *United States v. Powell*, 444 F. App'x 517, 520 n.4 (3d Cir. 2011). Similarly, in a case involving an order under Section 2703(d) requiring an Internet service provider to reveal the Internet protocol address assigned to a particular screen name as well as other attendant information, the Tenth Circuit upheld the issuance of the order where it found that the details set forth in the application were specific and "certainly would lead to a reasonable suspicion" that [the person using the screen name for which the information was sought] was involved in [a crime]." *United States v. Perrine*, 518 F.3d 1196, 1203 (10th Cir. 2008).

The Application at issue in this matter crosses the Section 2703(d) bar. First, the Application includes numerous specific and articulable facts surrounding the armed robbery that occurred on October 1, 2010; the preparations made for that robbery; Defendant's alleged ties to the one known participant in the robbery (at the time of the cell-site Application); and Defendant's alleged skill set and modus operandi for stealing cars like the ones involved in the robbery.

Second, the facts that the Government set forth in its Application provide a reasonable basis for the Government to have believed at the time of the Application that Defendant was a suspect in the robbery. Among other allegations, the Application asserts that its investigation had revealed at least four people to have been involved in the robbery, based on eyewitness accounts and surveillance. Only Moss was identified at that time, however. Therefore, the investigation was attempting to determine who the other three or more conspirators were when the Government submitted its Application.

In reviewing Moss's cell site records, the Government discovered evidence that heavily suggested that Moss had been involved in the theft of the two cars stolen from Coconut Creek in the early morning hours of September 17 and September 28, 2010, which were later used to perpetrate the crime. During his apparent trips to Coconut Creek to obtain the stolen cars, Moss spoke on his phone to people at two different cell phone numbers. Even assuming that the Government had identified the subscribers to those telephone numbers as people other than Defendant, that still left at least one more coconspirator.

Moreover, if Moss drove a car to Coconut Creek where the cars were stolen — which seems highly likely, given the time of day and the lack of available public transportation at that time — at least one other person would have had to have ridden with him in order to steal each car and bring both the stolen vehicle and Moss's car back. On September 17, 2010, Moss was at his home in Opa Locka at 2:37 a.m. and at Coconut Creek at 4:24 a.m., leaving a window of approximately one hour and forty-five minutes. But the Court takes judicial notice that, traveling at the designated speed limits, the trip between the two cities requires only about forty minutes when no traffic exists. So the extra hour, or so, could have been used to pick up someone to help steal the car in Coconut

Creek.

The allegations concerning Defendant's alleged theft of the car on May 25, 2010, reflect significant similarities between the May 25 crime and the thefts of the cars used in the October 1, 2010, armed robbery. Specifically, the Application asserts that all three cars were stolen from the same city — Coconut Creek — at about the same time of day — the very early morning hours.[12] Considered against the allegations that Moss and Defendant were known associates and that sources had identified Defendant as a person possibly involved in the October 1, 2010, armed robbery, these averments provided a reasonable basis for the Government to have believed at the time of the Application that Defendant was a suspect in the robbery.

Finally, the Government submitted sufficient allegations to show a reasonable basis to believe that the cell-site information sought would be relevant and material to the ongoing investigation. Moss's cell-site records firmly placed Moss at the scene of the thefts of both cars used in the October 1, 2010, robbery. Once the Government rationally identified Defendant as a suspect in the robbery, it was reasonable for it to entertain the notion that Defendant's cell-site information would be similarly relevant and material to the ongoing investigation. Because the Application satisfies the Section 2703(d) standard, the Order is upheld.

### III.  Conclusion

For the foregoing reasons, Defendant Bobby Ricky Madison's Motion to Suppress Cell

---

[12]The Court does not consider the allegation that Defendant lived near Moss in Opa Locka, as the Court finds that the implication of that allegation was not accurate. Had the Court considered this fact in the analysis — or even that Defendant lived in Liberty City, another significant similarity would have existed: the alleged car thieves in all three cases would have driven at least approximately thirty miles to steal cars from Coconut Creek.

Phone Records [D.E. 198] is **DENIED**.

      **DONE and ORDERED** at Fort Lauderdale, Florida, this 30th day of July 2012.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies:

Counsel of Record