UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-60285-CR-ROSENBAUM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DARYL DAVIS,
HASAM WILLIAMS, *et al.*,

        Defendants.
_____/

## ORDER ON DEFENDANTS DAVIS AND WILLIAMS'S
## MOTION *IN LIMINE* TO EXCLUDE CELL-SITE MAPS

This matter comes before the Court upon Defendants Daryl Davis and Hasam Williams's[1] Motion *in Limine* to Exclude the Government's Erroneous and Misleading Maps Purporting to Place a Cell Phone Within a Limited Coverage Area [D.E. 677]. Because the Court has already ruled on Defendants' Motion *in Limine* to Exclude Evidence Regarding Location of Cell Phones Based Upon Call Detail Records [D.E. 453], *see* D.E. 508, D.E. 628 at 137:6-144:23, and Defendants' current Motion *in Limine* seeks a subsection of the same relief as Defendants' first Motion *in Limine*, the Court construes Defendants' pending Motion *in Limine* as a motion for reconsideration. For the reasons set forth below, the Court now denies Plaintiff's Motion for Reconsideration.

### *I. BACKGROUND*

Defendants Daryl Davis, Hasam Williams, Terrance Brown, Toriano Johnson, and Joseph K. Simmons were indicted for charges relating to an alleged conspiracy to commit a string of

---

[1] *See* William Strunk, Jr., & E.B. White, *The Elements of Style* 13 (4th ed. 1999).

robberies of armored Brink's trucks. During the final robbery charged, Nathanial Moss, one of the alleged co-conspirators, shot and killed a Brink's truck messenger.

In investigating the case, the Government obtained the call-detail records for telephone numbers allegedly associated with Defendants, for periods when the robbery and attempted robberies were allegedly occurring. On behalf of the Government, Federal Bureau of Investigation Special Agent David Magnuson analyzed the call-detail records and prepared maps, pinpointing the locations of the antennae on the cell towers that the telephones used during the calls at issue. Agent Magnuson further indicated on the maps 120-degree cones emanating out from the antenna used on each of the cell towers in question, showing Agent Magnuson's opinion about the most likely areas where the telephones used to make the calls were located at the times that they used the cell towers at issue.

In Defendants' first Motion *in Limine*, Defendants sought to preclude the Government from introducing any evidence "purporting to place the location of any call from a cell phone on the basis of call detail records and cell tower location information supplied by cellular telephone carriers." *See* D.E. 453 at 1. More particularly, Defendants argued that the Court should not permit Agent Magnuson to testify regarding the maps that he had prepared charting the cell towers used by the cell telephones in making calls at times relevant to the events charged in this case. After a hearing held pursuant to *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, the Court denied Defendants' Motion *in Limine*, finding that Agent Magnuson's expected testimony, including his use of the maps that he had prepared, satisfied the threshold requirements of admissibility under Rule 702, Fed. R. Evid. *See* D.E. 628 at 137:6-144:23.

Defendants' latest Motion *in Limine* again seeks to exclude the Government from introducing Agent Magnuson's maps and testimony concerning the areas most likely to have been contained in the sectors being serviced by the cell towers used by the cell phones that made calls during events

relevant to the allegations in this case. *See* D.E. 677. In support of their Motion, Defendants state that, following the *Daubert* hearing on Defendants' first Motion *in Limine*, Defendants retained a cell-site-data expert who advised them that Agent Magnuson's maps are incorrect, misleading, and inconsistent with generally accepted scientific knowledge in the community. *Id.* More specifically, Defendants assert that their expert, Manfred Schenk,

> unlike Agent Magnuson, has experience working with these cell tower networks and understands how they function . . . . Based on his numerous years as a network engineer, Mr. Schenk proffers that these cell towers cover at least twenty square miles. And a cell phone battery does not limit the cell phone from using a tower that is twenty miles away. As these maps seem to depict two square miles, instead of the twenty square miles that is relied upon by experts in the community, these maps are not based upon a reliable scientific methodology. . . . [T]hese maps do not include a key or a scale, making it impossible for the fact finder to determine whether Agent Magnuson's maps are reliable. The limited coverage areas in each of these maps place the cell phone much closer to a given tower than is the standard. . . .

D.E. 677 at 4.

## II. DISCUSSION

"[R]econsideration of a previous order is an extraordinary remedy to be employed sparingly." *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002) (citing *Mannings v. School Board of Hillsborough County*, 149 F.R.D. 235, 235 (M.D. Fla. 1993)). In the Eleventh Circuit, courts should grant motions for reconsideration only where (1) an intervening change in controlling law happens; (2) new evidence is discovered; (3) the need to correct clear error or prevent manifest injustice exists; or (4) a patent misunderstanding by the Court of the party's arguments has occurred. *FTC v. Capital Choice Consumer Credit, Inc.*, 2004 WL 5141452, *2 (S.D. Fla. May 5, 2004) (citing *Z.K. Marine, Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992)). Motions for reconsideration should not be permitted to be used "'as a vehicle to present new

3

arguments or evidence that should have been raised earlier, introduce novel legal theories, or repackage familiar arguments to test whether the Court will change its mind.'" *Id.* (quoting *Brogodon v. National Healthcare Corp.,* 103 F. Supp. 2d 1332, 1338 (N.D. Ga. 2000)). If the courts allowed motions for reconsideration under such circumstances, the litigant would receive "'two bites at the apple.'" *See id.* (quoting *American Home Assurance Co. v. Glenn Estess & Assocs.*, 763 F.2d 1237, 1239 (11th Cir. 1985)).

Presumably, Defendants seek reconsideration based on "new evidence" in the form of Schenk's opinion. Because Schenk's opinion as proffered does nothing to undermine the fact that Agent Magnuson's opinions satisfy the threshold *Daubert* standard, the Court denies Defendants' Motion.

As explained when the Court ruled on Defendants' original Motion *in Limine*, when a party proffers the testimony of an expert under Rule 702 of the Federal Rules of Evidence, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). In making the determination of whether expert testimony and any report prepared by the expert may be admitted, the Court engages in a three-part inquiry of whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert*, 509 U.S. at 589). The Eleventh Circuit refers to each of these requirements as the "qualifications, "reliability," and "helpfulness" prongs. *United States v. Frazier*,

387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the court must individually analyze each concept. *Id.*

In a district court's analysis under *Daubert*, the court must take on the role of a gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Under this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). But "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341; *Maiz*, 253 F.3d at 666 (quoting *Alison*, 184 F.3d at 1311). Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293, n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

In their Motion for Reconsideration, Defendants once again challenge the admissibility of Magnuson's testimony under the qualifications and reliability prongs of *Daubert*. Beginning with the qualification prong, an expert may be qualified "by knowledge, skill, experience, training, or education." *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (citing Fed. R. Evid. 702). Moreover, "[a]n expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id.* (citing *Maiz*, 253 F.3d at 665).

Determining whether a witness is qualified to testify as an expert "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed

5

testimony." *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1314-16 (N.D. Ga. 2002).  Under this inquiry, significantly, an expert must satisfy a relatively low threshold, beyond which qualification becomes a credibility issue for the jury.  *Martinez v. Altec Indus., Inc.*, 2005 WL 1862677, *3 (M.D. Fla. Aug. 3, 2005); *see also Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 & n.10 (5th Cir. 1999) (explaining that after an individual satisfies the relatively low threshold for qualification, vigorous cross examination is the appropriate means for attacking the credibility of an expert's testimony), *superseded by rule on other grounds as recognized in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002).  After the district court undertakes a review of all of the relevant issues and of an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion.  *See Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976).

Here, Agent Magnuson's qualifications easily clear the low hurdle imposed by *Daubert*.  He has obtained certifications and training in the following technologies and techniques relevant to call-detail and cellular-site analysis:

> (1) Project PinPoint Cellular Survey Analysis & Geo-Location Certification
>
> (2) JDSU-E6474A Phone-Based Drive Test and Network Analysis (Gladiator) Certification
>
> (3) Emerging Technology Systems — Cellular Network Technology Course: Received in excess of 300 hours of specialized training in Radio Frequency Theory relating to cellular telephone network systems including GSM, iDEN, CDMA, UMTS, and LTE cellular protocols.  Certified April and August 2010.
>
> (4) Cellebrite UFED Physical-Pro Forensic Cell Phone Analyzer Certification
>
> (5) Pen-Link Call Analysis Training School Certification

(6) Advanced Project Pin-Point Certification

(7) Completed Cellular Network and Legal Compliance training with legal and engineering representatives from AT&T Wireless, Sprint/Nextel Communications, Verizon Wireless, T-Mobile, U.S. Cellular, Cricket Communications, and Metro PCS (80 hours)

(8) JDSU-E6474A Phone Based Drive Test and Network Analysis (Gladiator) Re-Certification

D.E. 467-1; *see also* D.E. 628 at 13:11-14:6. In addition, Agent Magnuson testified that "all day, every day," he analyzes cellular telephone records and has done so for years. *See* D.E. 628 at 14:7-:10. He further explained that, as a result of the success that he and other FBI agents experienced using call-detail records in investigations, the FBI formulated a nationwide Cellular Analysis Survey Team ("CAST") who sole job it is to analyze cellular telephone records for use in investigations. *See id.* at 29:10-30:13; *see also* D.E. 467-1. After five years of employing cellular-telephone record analysis in his investigative work with the FBI, Agent Magnuson joined CAST in 2010, the unit he has worked with exclusively since that time. D.E. 628 at 29:10-30:13.

So, for the past eight years, Agent Magnuson has regularly analyzed cellular-telephone records in conducting criminal investigations, and, for the past three years, Agent Magnuson has done nothing but analyze cellular-telephone records in support of criminal investigations. In so doing, he has repeatedly estimated cell towers' service sector areas, and law-enforcement officers have consistently relied upon these estimates in conducting their criminal investigations. Indeed, Agent Magnuson estimated that, in the course of performing his duties for the FBI, he has analyzed numerous call records and has prepared thousands of maps based on the records. *Id.* at 29:14-:25. Based on this evidence, Magnuson is qualified to opine on call-detail records, and, in particular, the areas most likely to fall within the sector serviced by a particular cell tower, by knowledge, skill,

7

experience, training, and education.[2]

As for the reliability of Agent Magnuson's methodology, that, too, satisfies *Daubert*'s requirements. In determining the reliability of an expert witness, the Court considers such factors as "(1) whether the expert's theory can be tested and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (citing *McCorvey*, 298 F.3d at 1256). These factors, however, are not exhaustive of the different considerations that a court may undertake in its determination of the reliability of an expert opinion under a Rule 702 analysis. *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)). Nor will all factors apply in every case. *United States v. Barnes*, 481 F. App'x 505, 513 (11th Cir. 2012) (quoting *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (*en banc*)). "In evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7. The applicability of *Daubert* factors in assessing the reliability in any "given case will depend . . . on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (quoting *Kumho Tire Co., Ltd.*, 526 U.S. at 150) (internal quotations omitted).

Here, Agent Magnuson testified that, in addition to the information contained in the call-detail records, he used his understanding of how the network, the towers, and the antennae interact as a cellular system in estimating the sector areas. *See* D.E. 628 at 26:1-:15. He also explained that experts in the field typically rely on call-detail records to estimate the sectors. *Id.* at 26:23-27:3.

---

[2]Agent Magnuson has been admitted as an expert to testify in approximately fifteen other federal and state cases. D.E. 628 at 15:7-:15.

With regard to his consideration of the network, Agent Magnuson indicated that he looks at the population of cell towers because where more towers are present, more sectors of radio-frequency energy emanating from those towers are likewise present, whereas, in less populated areas, fewer towers generally exist, so the towers have to service larger areas, which means that they must overcome different environmental factors than towers in the more densely populated areas. *Id.* at 27:23-28:13. Accordingly, in estimating cell-tower sectors, Agent Magnuson uses his knowledge and experience to account for the locations of other towers near the one that was used in the call. *Id.* at 28:14-:17.

In addition, Agent Magnuson stated that he has previously tested his sector estimates in other cases. *Id.* at 27:9-:22. More specifically, using JDSU network optimization software and Gladiator interpolation software, Agent Magnuson has surveyed networks and obtained and interpolated the information to show the actual radio-frequency footprints of the sectors. *Id.*; *see also id.* at 30:21-31:15. In so doing, he has consistently found that using a 120-degree pie shape and extending approximately 50% to 70% of the way to the nearest cell tower is a "very, very accurate depiction" of the sector of radio-frequency energy emanating from the antenna on the cell tower, and he has never found that his maps were wrong. *Id.* at 27:9-:22; *id.* at 32:2-:11; *id*. at 33:3-:14. According to Agent Magnuson, worldwide, the FBI has used this methodology to cross-check the accuracy of sector maps drawn using the techniques employed by Agent Magnuson. *Id.* at 31:16-32:1.

Defendants suggest that Agent Magnuson's methodology for estimating the 120-degree sectors does not meet *Daubert*'s reliability requirement because Agent Magnuson "presented no scientific calculations that he specifically used for his conclusion that the radius of the 'fields of energy' for each tower is only two miles, or to explain his basis for plotting a specific coverage area of a specific tower in the manner that he did." D.E. 677 at 3. Ironically, however, Defendants'

9

description of the basis for Schenk's opinions that Agent Magnuson's estimates are wrong also do not appear to be based on mathematical calculations. Nevertheless, for support for their position that Agent Magnuson's methodology is not sufficiently reliable, Defendants direct the Court to *United States v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012).

In *Evans*, the Government sought to present the testimony of FBI Special Agent Raschke. The Government sought to present Agent Raschke's opinions regarding the sectors covered by the cell towers used for calls made during events relevant to the charges in that case. Agent Raschke testified that he uses a theory known as "granulization" to estimate the range of cell sectors. *Id.* at 955-56. As Agent Raschke explained, he estimates the "range of certain cell sites based on a tower's location to other towers." *Id.* He further stated that he has used his theory "numerous times in the field to locate individuals in other cases with a zero percent rate of error." *Id.* at 956. In addition, Agent Raschke testified, other FBI agents had also successfully used this same method without error. *Id*. Beyond this, however, the Government offered no additional evidence regarding the "granulization theory." *Id.*

The *Evans* Court "remain[ed] unconvinced that granulization theory is reliable." *Id.* In reaching this conclusion, the court expressed concern that Agent Raschke conducted "no scientific calculations that take into account factors that can affect coverage." *Id*. Moreover, the court found that "the granulization theory remains wholly untested by the scientific community . . . ." *Id.*

This Court first notes that other courts have reached the opposite conclusion of the *Evans* Court regarding the reliability of an agent's methodology in estimating cell sectors where the agent used cell-phone records and his general knowledge and understanding of cellular phone networks and where the agent testified that he and others had used that methodology numerous times without error. *See, e.g.*, *United States v. Schaffer*, 439 F. App'x 344, 346-47 (5th Cir. 2011) (upholding the

10

admissibility of an FBI agent's testimony pinpointing the locations where cellular telephones were allegedly used, based on "his extensive knowledge and experience in the field" and noting that the agent testified that he had used the technique without error on at least 100 occasions and that the FBI had used it successfully at least 1,000 times); *United States v. Fama*, 2012 WL 6102700, *3-4 (E.D.N.Y. Dec. 10, 2012); *United States v. Allums*, 2009 WL 806748, *2-3 (Mar. 24, 2009).

In this case, even setting aside the specific methodology that Agent Magnuson uses to estimate a sector,[3] Agent Magnuson testified that he has actually scientifically tested his methodology by using the JDSU and Gladiator software to physically map sectors and comparing those actual sectors with Agent Magnuson's estimated sectors and that this testing has demonstrated his sector estimates to be "very, very accurate." Indeed, the FBI has found the methodology employed by Agent Magnuson and others on the CAST unit to be so reliable that it has established the CAST unit for the sole purpose of analyzing call records as Agent Magnuson does and using those analyses in criminal investigations, including to locate missing persons. The FBI CAST unit's three-year existence, the thousands of mapping solutions it has created and law enforcement has successfully used for purposes including finding missing persons, and the FBI's worldwide daily employment of the CAST techniques described by Agent Magnuson constitute field testing and demonstrate sufficient reliability to enter through *Daubert*'s reliability gate, regardless of whether Agent Magnuson actually used mathematical calculations to estimate sector size. *See Jones v. Webb*, 2013 WL 1442491 (11th Cir. Apr. 8, 2013).

The mere fact that mathematical or other precise scientific calculations are not employed in reaching an expert opinion does not render an expert opinion unreliable where other indicia of

---

[3]When asked about granulization theory, Agent Magnuson stated that he was not aware of what it was and that he does not knowingly employ it.

11

reliability of the methodology exist. In *Jones*, for example, Jones, the plaintiff, alleged that he had been beaten by a deputy during a road stop. To contest Jones's version of events, the deputy presented the expert testimony of Dr. Mark Choquette, who opined that if Jones's description of the events had been accurate, Dr. Choquette would have expected to see lacerations to the scalp, skull fractures, torn blood vessels, and brain tissue damage, as well as some damage to the trachea and larynx. Jones challenged the admission of Dr. Choquette's testimony, arguing that Dr. Choquette did not sufficiently describe the methodology that he used to reach his opinion, so his opinion was not reliable. The Eleventh Circuit rejected Jones's argument, noting that Dr. Choquette was an experienced emergency room physician who had treated "hundreds of patients with blunt force trauma to the head caused by objects of one kind or another, and he was using that experience, combined with Mr. Jones' medical records, to render his opinion." *Id.* at *3. In explaining its ruling, the Eleventh Circuit stated, "Our cases have made clear that experience can be a proper basis for testimony . . . ." *Id.* (citing *United States v. Garcia*, 447 F.3d 1327, 1336 (11th Cir. 2006)).

This case is no different. Like the medical records on which Dr. Choquette in part based his opinions in *Jones*, the call-detail records here were employed extensively by Agent Magnuson to develop his estimated sectors. And, just as Dr. Choquette used his expertise gained through treating hundreds of patients with injuries similar to those complained of by Jones to conclude that Jones's description could not have been accurate, Agent Magnuson relied on his expertise developed through successfully evaluating cell-phone records for eight years — and doing nothing but that for three of those eight years — to estimate the sectors in this case. Under these circumstances, particularly where Agent Magnuson has testified to the successful testing of his methodology, the Government has adequately demonstrated the reliability of Agent Magnuson's methodology to satisfy *Daubert*'s reliability prong.

As the Eleventh Circuit has cautioned, "[t]he purpose of *Daubert* is to determine whether a methodology 'is sufficiently reliable' to be presented to a jury." *Rutledge v. NCL (Bahamas), Ltd.*, 464 F. App'x 825, 828 (11th Cir. 2012) (quoting *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1338 (11th Cir. 2003). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 829 (quoting *Daubert*, 509 U.S. at 596) (quotation marks omitted). Consequently, to the extent that the defense wishes to present evidence or to cross examine to suggest that using mathematical calculations of sectors provides a better way of identifying sectors, it is free to do so. *See United States v. Fama*, 2012 WL 6102700 at *3-4 (concerns regarding whether a cell-site expert has considered the potential impact of various factors that can impact the communication of a cellular telephone with a particular cellular tower "go [to] the weight of [the] testimony, not the reliability"); *see also United States v. Allums*, 2009 WL 806748 at *2-3 (same); *United States v. Jones*, ___ F. Supp. 2d ___, 2013 WL 246615, *3-4 (D.D.C. Jan. 23, 2013) ("to the extent that [agent's] testimony relies on assumptions about the strength of the signal from a given cell tower, any challenges to those assumptions go to the weight of his testimony, not its reliability").

### III. CONCLUSION

For the foregoing reasons, Defendants Daryl Davis and Hasam Williams's[4] Motion *in Limine* to Exclude the Government's Erroneous and Misleading Maps Purporting to Place a Cell Phone

---

[4] *See* William Strunk, Jr., & E.B. White, *The Elements of Style* 13 (4th ed. 1999).

Within a Limited Coverage Area [D.E. 677] is **DENIED**.

**DONE AND ORDERED** this 17th day of May 2013.

/s/ Robin S. Rosenbaum
ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies:
The Honorable Lurana S. Snow
Counsel of Record